IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

NICOLE KONETSCHNI,          :
           Plaintiff,          :          NO. 3:14-cv-2087
                       :
    v.          :
                       :          (Mariani, J)
CAROLYN W. COLVIN,          :          (Saporito, M.J.)
Acting Commissioner of          :
Social Security,          :
           Defendant.          :

## REPORT AND RECOMMENDATION

This is an action brought under 42 U.S.C. §405(g), seeking judicial review of the Commissioner of Social Security's ("Commissioner") final decision denying Nicole Konetschni's application for Social Security Disability Income Benefits under Title II of the Social Security Act U.S.C. §§ 401-433. This matter has been referred to the undersigned Magistrate Judge for the preparation of the report and recommended disposition pursuant to the provisions of 28 U.S.C. §636(b) and Rule 72(b) of the Federal Rules of Civil Procedure.

Konetschni asserts that the ALJ failed to give appropriate weight to her treating physician's opinion that if placed in a work setting, he would expect her to suffer a decrease in functioning and have a marked

limitation in being able to respond appropriately to the public, co-workers and changes in a usual work setting, and an extreme limitation in interacting appropriately with supervisors. Konetschni also contends that the ALJ erred in failing to find her credible. The Commissioner disagrees, and asserts that the ALJ's decision was supported by substantial evidence that Konetschni was not disabled and that she could perform other work that existed in significant numbers in the economy. Further, the Commissioner maintains that the treating physician's opinion was not entitled to controlling or significant weight because it was not consistent with his treatment notes and it was fueled by a desire to assist his patient.

For the reasons stated herein, we respectfully recommend that the decision of the Commissioner denying Konetschni's application for benefits be VACATED and the case be REMANDED to conduct a new administrative hearing.

I.   BACKGROUND AND PROCEDURAL HISTORY:

The Plaintiff, Nicole Konetschni, is an adult individual, born in 1971. Konetschni was thirty-nine (39) years of age at the time of her originally alleged onset of disability, October 9, 2009. At the evidentiary hearing,

her onset date was amended to August 31, 2010, at which time she was forty-two (42) years old. (Tr. 28)

Konetschni's age at the onset date makes her a "younger person" under the Commissioner's regulations,(whose age generally does not affect his/her ability to adjust to other work. See 20 C.F.R. §404.1563. Konetschni resides with her parents in the Middle District of Pennsylvania. She has a high school diploma, a bachelor's degree in social work, and a master's degree in special education. (Tr. 31). Konetschni worked as a special education teacher for six years. She has also worked as a recreational aide and an activities director. She also volunteered at a food pantry until August 31, 2010, her alleged onset date. Since that time, she no longer volunteers at the food pantry because it requires her  to work closely with people. Currently, she volunteers at a humane society.

When Konetschni protectively filed her application for benefits on January 31, 2011, she alleged impairments due to diabetes, depression, tremors, migraines, bipolar disorder, fibromyalgia and post-traumatic stress disorder (PTSD). (Tr. 30). She alleges these impairments are disabling. Her claim was initially denied on July 6, 2011.

Konetschni filed a timely written request for a hearing on July 21, 2011. A hearing was held on the matter on January 17, 2013, in Harrisburg before Administrative Law Judge Theodore Burock (the "ALJ"). Konetschni appeared and testified at the hearing. She was assisted by counsel, throughout the proceeding. Additionally, Vocational Expert Brian Bierley (the "VE") also appeared and testified.

On March 29, 2013, the ALJ issued a written decision in which he concluded that Konestchni was not disabled during the relevant time period and that she is capable of performing other work that exists in sufficient numbers in the national economy. (Tr. 20). Plaintiff filed a timely request for review with the Appeals Council on May 17, 2013. Thereafter, on September 29, 2014, the Appeals Council denied Konestchni's request for review. (Tr. 1). The ALJ's decision became the final decision of the Commissioner.

Konetschni then filed the instant complaint in a timely fashion on October 30, 2014. (Doc. 1). The Commissioner's timely answer to the complaint was filed February 2, 2015. (Doc. 10). Together with her answer, the Commissioner filed a complete copy of the administrative record including the evidence that was first considered by the Appeals

Council. (Doc. 11).

On March 29, 2013, the ALJ issued a written decision which concluded that Konetschni's alleged impairments are severe within the meaning of the regulations, but not severe enough to meet or medically equal any of the impairments listed in 20 C.F.R., Part 404, Appendix 1, Subpart P. (Tr. 13).  In his decision, the ALJ concluded that the claimant has the residual functional capacity ("RFC") to perform sedentary work as defined in 20 C.F.R. §404.1567(a) except she can only occasionally stoop, kneel, crouch, crawl, and climb ramps and stairs, she can never climb ladders, ropes, or scaffolds, and she is limited to the performance of routine, repetitive tasks involving no more than very short and simple instructions, no more than occasional interaction with coworkers or supervisors, and no public contact. (Tr. 14)   The ALJ   considered Konetschni's education, work experience, and RFC and concluded there are jobs that exist in significant numbers in the economy that she can perform, according to the testimony of the VE. (Tr. 19).

Konetschni stated that she has been diagnosed with bipolar disorder, depression, PTSD, panic attacks, obsessive-compulsive disorder, Asperger's syndrome and mood disorder.  (Tr. 29).  The PTSD arises out

of an incident which occurred in August 2010, when she met a man online and agreed to go to his apartment.  When she arrived at his apartment, he held her against her will, tied her up, and assaulted her. (Tr. 367). Since that time, she testified that she has difficulty being around people, more particularly males. (Tr. 40,43,53).   She claimed she stays home all the time, except on occasion when she goes out with her parents. Konetschni states the only time she is able to go out by herself is to volunteer at the animal shelter.  She volunteered at the animal shelter prior to the attack, and the only reason she is comfortable being at the animal shelter with other individuals, is because she had contact with them prior to the attack.  Occasionally, when the shelter has tourists, Konetschni is informed so that she can leave in order to avoid large numbers of people. (Tr. 54)  If it is a small group, she can usually stay but there are times she becomes mentally confused about the people, the noises, and all the movement around her. (Tr. 54-55).  Konetschni was diagnosed with fibromyalgia, arthralgia, and right knee issues.  (Tr. 30). Despite these diagnoses,  she testified that her mental issues preclude her from substantial gainful work activity. (Tr. 30).

Konetschni has a driver's license and typically drives a couple times

a week to and from appointments and/or the animal shelter. (Tr. 31). Occasionally, on days when her pain kept her awake the night before, her mother drives her to and from her destination. (Tr. 55). She often has anxiety when sitting in waiting rooms at doctor appointments. (Tr. 56).

Konetschni stated that she constantly has pain somewhere. (Tr.32). She stated the pain gets worse when doing laundry or when sitting or standing in one position for any length of time. (Tr. 33). She stated that she takes pain medication that is not always effective. (Tr. 33). The doctors have modified her pain medications and despite these medication modifications, she testified that she still experiences the pain at times. (Tr. 33). The medications make her drowsy and she forgets things. (Tr. 34). Konetschni stated that she has tremors in her wrists, caused by stress or are unexplained which make it difficult for her to write and/or hold a spoon to eat. (Tr. 34-35,49). These tremors occur five of the seven days per week and usually last about half-an-hour. (Tr. 49). She stated that the tremors happen when she is on the computer. She has tried using a smaller mouse or a touchscreen computer, but neither helped. (Tr. 50). When this happens, she usually stops using the computer and resorts to watching television or laying down. (Tr. 50).

At times, Konetschni experiences migraines when she wakes in the morning and they worsen throughout the day. (Tr. 35). At other times her migraines begin in the middle of the day. She gets relief by laying down in a cool room. (Tr. 35). When she taught school and would experience migraines, she turned off the lights in the room and sat in quiet. She was prescribed Imitrex but she claimed it upset her stomach, causing her to become physically ill. (Tr. 35).

She checks her blood sugar daily which usually ranges between 140-150 but, at times, it gets as high as 200. When her sugar is elevated, she has pain in her feet and toes. The pain usually starts at her feet, travels part-way up her legs, and causes a burning sensation in her legs. (Tr. 36-37).

Konetschni stated she has obsessive-compulsive disorder (OCD). She is only able to focus on one thing at a time which at times causes her to panic, obsess, and show unusual emotional reaction. She claimed to obsess rather then focus. (Tr. 37-38). Konetschni stated that she has a mild form of dyslexia which causes difficulty in telling time and dates. (Tr. 39). Her dyslexia also caused her to obsess. (Tr. 39). She stated that she needs to know things such as exactly what time her parents are coming

home.  Her parents call when they are ten minutes away, so she can clean the surface of things, such as the refrigerator, sink, and microwave just before they arrive.  She stated this is a ritual type of behavior. (Tr. 52).

Konetschni stated that she has had a mild form of Asperger's since she was three.  She has dealt with it all of her life.  She has a very hard time interacting with people and socializing.  Since the incident in August 2010, socializing has become worse. (Tr. 40).

She stated she has suicidal thoughts constantly.  She gets moody, depressed for long periods of time, and she cuts herself.  She claims the suicidal thoughts come from anxiety, buildup of emotions, not knowing how to handle her emotions and how to express them with people involved in the situation.  She also fears she will not do things the right way.  She takes Xanax to help her deal with those issues. (Tr. 40-41).

Konetschni stated she has trouble sleeping and anxiety both of which  come from her PTSD.  Her PTSD symptoms may be triggered by or escalate if a man walks into a room or if she hears voices that speak the same words as her attacker. (Tr. 42,43).

Konestschni stated that she has right knee pain, in part because of fibromyalgia, which impacts her ability to walk up steps, and usually she

sits down to complete tasks.  She stated she can walk a maximum of two blocks or less.  Some days the pain is worse than others.  At times, she has to rest when walking, and sometimes she rests longer than she has actually walked.  (Tr. 44,48).  She stated she sits down after more than five minutes of walking.  She cannot lift more than ten pounds and she cannot perform many chores around the house.  (Tr. 44-46).  She also stated she grew up dancing, but can no longer dance. (Tr. 47).  She socializes on the internet by email with friends, family, and her church group a couple times per week.  She stated it is easier for her to email them than to see them in person. (Tr. 46).

Konetschni stated that she visits with her four-year-old nephew at her brother's home.  Sometimes she has to modify her activities with her nephew because it's easier to sit and watch him do things alone, rather then do them with him. (Tr. 46-47).

Konetschni stated that she does not sleep well, and about four to five times per week she is kept awake with pain.  As a child, she was very involved in a youth group, became a leader, and was a liturgist. (Tr. 64-65).  Since the attack, she no longer attends church because she becomes emotional, begins to cry, and does not know how to interact with people.

She physically shies away from people to avoid shaking their hands and hugging them. (Tr. 54).

She stated that other than doctor appointments, the shelter, and visiting her nephew, she does not go anywhere else for fear that there will be people around and they may brush up against her. (Tr. 56). She tries to go to the grocery store, but at times finds it impossible and frustrating. She tries to go to the grocery store at a time when there will be the least amount of people. She will only walk down an aisle if it is not occupied by anyone else. Sometimes she waits for the person to come out of the aisle before she will begin to walk down the aisle in order to avoid the chance of anyone rubbing up against her. (Tr. 57-58). When she returns from the grocery store, the pain from fibromyalgia restricts her to only putting away certain items and others wait until the next day. (Tr. 57).

She has trouble interacting with people and she claimed she would have trouble interacting with supervisors in a job setting. She also stated that she would struggle even if it were a female supervisor telling her what to do, because of what happened when she was attacked. (Tr. 59). She also feels with the Asperger's that she would need a job with a routine and predictability. Any changes in routine become confusing and

frustrating. (Tr. 59).

Konetschni stated that after the attack she did not report the incident to the police or file criminal charges. Rather, she opted to seek counseling. (Tr. 63).

Prior to the attack, Konetschni volunteered at a food pantry. She would grocery shop for families. Konetschni stopped volunteering because it required her to work too closely with other people. (Tr. 60).

Konetschni continues to see Dr. Shapiro of Spectrum Health, and her therapist, Diane Elson at Centerpoint Counseling, once every other week, but appointments vary. (Tr. 65).

She stated that everything has become much harder for her to do since the attack. She is emotional and continues to try to modify tasks in order to be able to do them correctly. She cries and becomes frustrated easily. She tries to just take care of herself and stay healthy instead of putting herself in places where she knows her comfort level will be compromised. (Tr. 66).

The VE testified that Konetschni's past work included employment as: (a) a recreational aide, which he categorized as light, unskilled work with a Specific Vocational Preparation ("SVP") level of 2; (b) a special

education teacher which is light, skilled job with a SVP of 7; and (c) an activities director, which is a light, skilled job with an SVP of 8. (Tr. 68). The VE testified that, based on the RFC finding ultimately adopted by the ALJ, Konetschni was unable to perform her past work. (Tr. 69)

The VE identified two jobs that exist in significant numbers in the national economy that Konetschni could perform with her RFC, age, education, and past work experience.  The VE testified that she could perform the job of a final assembler, DOT 713.687-018, a sedentary, unskilled position with an SVP of 2, for which 33,000 positions exist nationally.  The VE testified that she also could perform the job of an inspector, DOT 669.687-014, a sedentary, unskilled position with an SVP of 2, for which 31,000 positions exist nationally. (Tr. 69-70).

II.   <u>Standard of Review</u>.

When reviewing the denial of disability benefits, the Court's review is limited to determining whether those findings are supported by substantial evidence in the administrative record. *See* 42 U.S.C. § 405(g) (sentence five); <u>Johnson v. Comm'r of Soc. Sec.</u>, 529 F.3d 198, 200 (3d Cir. 2008); <u>Ficca v. Astrue</u>, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of

evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. Richardson v. Perales, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). In an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." Leslie v. Barnhart, 304 F. Supp. 2d 623, 627 (M.D. Pa. 2003). The question before the Court, therefore, is not whether the claimant is disabled, but whether the Commissioner's finding that he or she is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. *See* Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL

14

940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence.") (alterations omitted); Burton v. Schweiker, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The [Commissioner]'s determination as to the status of a claim requires the correct application of the law to the facts."); *see also* Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); Ficca, 901 F. Supp. 2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

To receive disability benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 20 C.F.R. § 404.1505(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment[1] that makes it impossible to do his or her previous work or

---

[1] A "physical or mental impairment" is an impairment resulting from "anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

any other substantial gainful activity[2] that exists in the national economy. 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1505(a).

The Commissioner follows a five-step sequential evaluation process in determining whether a claimant is disabled under the Social Security Act. 20 C.F.R. § 404.1520(a). Under this process, the Commissioner must determine, in sequence: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment;[3] (4) whether the claimant is able to do past relevant work, considering his or her residual functional capacity ("RFC");[4] and (5) whether the claimant is able to do any other work, considering his or her RFC, age, education,

---

[2] "Substantial gainful activity" is work that (1) involves performing significant or productive physical or mental duties, and (2) is done (or intended) for pay or profit. 20 C.F.R. § 404.1510.

[3] An extensive list of impairments that warrant a finding of disability based solely on medical criteria, without considering vocational criteria, is set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1.

[4] "Residual functional capacity" is the most a claimant can do in a work setting despite the physical and mental limitations of his or her impairment(s) and any related symptoms (e.g., pain). 20 C.F.R. § 404.1545(a)(1). In assessing a claimant's RFC, the Commissioner considers all medically determinable impairments, including those that are not severe. Id. § 404.1545(a)(2).

and work experience. Id. The claimant bears the initial burden of demonstrating a medically determinable impairment that prevents him or her from doing past relevant work. 42 U.S.C. § 423(d)(5); 20 C.F.R. § 404.1512; Mason, 994 F.2d at 1064. Once the claimant has established at step four that he or she cannot do past relevant work, the burden then shifts to the Commissioner at step five to show that jobs exist in significant numbers in the national economy that the claimant could perform consistent with his or her RFC, age, education, and past work experience. 20 C.F.R. § 404.1512(f); Mason, 994 F.2d at 1064.

III.   The ALJ's Decision Denying Konetschni's Application for Benefits

In his decision, the ALJ proceeded through each step of the five-step sequential evaluation process.  At step one, the ALJ found that Konetschni has not engaged in substantial gainful activity at any time between her alleged onset date of August 31, 2010 and the date of the ALJ's decision. (Tr.12).  At step two, the ALJ found that Konetschni had the following severe impairments: obesity, fibromyalgia, osteoarthritis, migraine headaches, bipolar disorder, ADHD, PTSD, and diabetes. (Tr. 12).  The ALJ also found that Konetschni had medically determinable but non-severe impairments due to knee injuries and thyroidism. (Tr. 13).

17

Konetschni also alleged disability due to the Asperger's Disorder, but the ALJ found that this condition was not medically determinable on the record presented. (Tr. 12-13). At step three, the ALJ found that Konetschni did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R., Part 404, Subpart P, Appendix 1. (Tr. 13).

Before proceeding to steps four and five of the sequential evaluation process, the ALJ assessed Konetschni's RFC. In making this determination, the ALJ is required to assess the credibility of Konetschni's subjective testimony on the subject of the intensity, persistence, and limiting effects of Konetschni's impairments in accordance with the mandates of 20 C.F.R. §404.1529, and Social Security Rulings 96-4p and 96-7p. The ALJ is also required to weigh the opinion evidence of record in accordance with the mandates of 20 C.F.R. §404.1527 and Social Security Rulings 96-2p, 96-5p, 96-6p, and 06-3p.

The record before the ALJ in this case included a consultative psychological evaluation by David Zehrung, M.D., who diagnosed Konetschni with bipolar disorder and assessed her with a GAF of 53. It also included statements by Harvey H. Shapiro, M.D., Konetschni's

treating psychiatrist, who diagnosed her with bipolar disorder, panic disorder, obsessive compulsive disorder, anxiety disorder, migraines, autistic spectrum, and PTSD. (Doc. 11-8, p.11).   He prescribed the following medications: lamical, cymbalta, clonidine patch.   He claimed that Konetchni could not work for the following reasons: extreme emotional energy changes, crippling tension episodes, poor attention, easily distracted, depression, suicidal risk and intense migraines.   (Id.) He initially gave her a GAF of 60.  Later he stated that the score of 60 was a typo and that the GAF should have read 35-40 based on the claimant's traumatic encounter on her amended alleged onset date.  After review of the testimony, the ALJ concluded that, during the relevant period, Konestschni retained the RFC to engage in sedentary work, as defined by 20 C.F.R. §404.1567(b), except:

> the claimant can only occasionally stoop, kneel, crouch, crawl, and climb ramps and stairs; can never climb ladders, ropes or scaffolds; and is limited to the performance of routine, repetitive tasks involving no more than very short simple instructions, no more than occasional interaction with coworkers or supervisors, and no public contact.

(Tr. 15).

At step four, the ALJ considered whether Konetschni could engage in her past relevant work. The ALJ relied on testimony by a VE to support his analysis at steps four and five of the sequential process. The ALJ found that Konetschni was unable to perform any past relevant work. The ALJ considered the claimant's age, education, work experience, and RFC, and found that there are jobs which exist in significant numbers in the national economy that she can perform. The VE testified that occupations exist in the economy that claimant would be able to perform given her restrictions, such as Final Assembler, DOT #713.687-018 (134 jobs regionally; 33,000 nationally) and Inspector, DOT #669.687-014 (140 jobs regionally; 31,000 nationally). As a result, at step five the ALJ found that Konetschni retains the ability to perform work that exists in significant numbers in the national economy. Therefore, the ALJ concluded that Konetschni is not disabled under the Social Security Act. (Tr. 20).

IV.  <u>Discussion</u>

In assessing the medical evidence supporting a claim for disability benefits, the ALJ must adhere to certain standards. One such standard, known as the treating physician rule, requires the ALJ to generally give

greater deference to the opinions of treating physicians than to the opinions of non-treating physicians because:

> [t]hese sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. §404.1527(d)(2).

In many cases, a medical opinion expressed by a claimant's treating physician is entitled to controlling weight. To be entitled to "controlling weight" an opinion must come from a "treating source" it must be "well-supported by medically acceptable clinical and laboratory diagnostic techniques," and it must be "not inconsistent with the other substantial evidence in your case record." 20 C.F.R. §404.1527(a)(2); 20 C.F.R. §404.1527(c)(2); Soc. Sec. Ruling 96-2p, 1996 WL 374188, at *2. Under the Social Security regulations, a "treating source" is defined as a "physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you." 20 C.F.R.

§404.1502. As to what constitutes an "ongoing treatment relationship," the regulation states:

> Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical conditions(s). We may consider an acceptable medical source who has treated or evaluated you only a few times or only after intervals (e.g., twice a year) to be your treating source if the nature and frequency of the treatment or evaluation is typical for your condition(s).

20 C.F.R. §1404.1502.

If not well-supported by medically acceptable clinical and diagnostic techniques or inconsistent with other substantial evidence in the case record, a treating source medical opinion is nevertheless entitled to deference. Soc. Sec. Ruling 96-2p, 1996 WL 374188, at *4. Ordinarily, it will be afforded "great weight," *See* Soc. Sec. Ruling 96-2p, 1996 WL 374188, at *2; Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000); Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir.1999). *See generally* 20 C.F.R. §404.1527(c) (detailing factors considered in evaluating weight given to a medical opinion).

Closely associated with the treating physician rule, the regulations require the ALJ to "always give good reasons in [the] notice of determination or decision for the weight" given to the claimant's treating source's opinion. 20 C.F.R. §404.1527(d)(2). Those good reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." Soc. Sec. Rul. 96–2p, 1996 WL 374188, at *5. The Third Circuit Court of Appeals have long been concerned with ALJ opinions that fail properly to consider, discuss, and weigh relevant medical evidence. *See* Dobrowolsky v. Califano, 606 F.2d 403, 406-07 (3d Cir. 1979).

Here, the ALJ favored the opinions of the state agency physicians over Konetschni's treating source, but as we demonstrate below, the ALJ failed to adequately consider the medical evidence of the treating physician and mischaracterized his opinions and observations. Plaintiff contends that the ALJ made his decision without the appropriate weight on the opinion of the treating physician, Dr. Shapiro, in violation of the treating physician's rule set forth in 20 C.F.R.§404.1527. We agree.

The ALJ gave "little weight" to Dr. Shapiro's opinion claiming his evaluation appeared inconsistent with his earlier treatment notes that Konetschni retained good mental status up until Dr. Shapiro completed his statement in December 2012, and his opinion is a likely exaggeration of her functional restrictions in order to assist her in obtaining disability benefits. (Tr. 348-352). We find that there is no basis in the record for the ALJ's findings regarding Dr. Shapiro's opinion.

First, Dr. Shapiro's treatment note of August 16, 2010, reflects that he described Konetschni's assault as a "terrible assault." (Tr. 366). Later, on October 26, 2010, he described the assault as a "brutal rape and torture" and noted Konetschni was seeing a therapist at Centerpoint Counseling. (Tr. 367). Dr. Shapiro did comment in his contemporaneous treatment notes that "she never went to the police, leading to some doubt about whether this started out with her more willing participation." (Tr. 367 (emphasis added)), but this hardly constitutes a finding by Dr. Shapiro "that the claimant was likely complicit in the initial traumatic encounter" (Tr. 17 (emphasis added)), nor does it "raise some question [ ] as to the validity of the claimant's statements regarding this incident" (Tr. 16). The mere fact that the claimant met a man over the internet and

24

accepted an invitation to enter his apartment in no way suggests that she was somehow "complicit" in the brutal and depraved assault that followed. (See Tr. 366-68).   Even if her expectations were less than entirely chaste, there is nothing in the record to suggest that the claimant anticipated or consented to being locked into the man's apartment, "raped with penetration," forced to perform oral sex, beaten with a belt buckle, urinated on, threatened to have her teeth smashed in, slapped "so hard [she] nearly lost her hearing," or have hot cigarette ashes put on her. (Tr. 366-68).   When she saw Dr. Shapiro six days later, she understandably reported flashbacks, nightmares, and other symptoms of PTSD. (Tr. 368). No valid conclusions about the claimant's truthfulness or the consistency of Dr. Shapiro's findings based on her statements can be drawn from the mere fact that she did not report the assault to the police.   See Haines v. Astrue, Civil No. SAG-10-cv-822, 2012 WL 94612, at *2 (D.Md. Jan. 10, 2012) ("[F]or many years, this country has recognized both the dramatic underreporting of rapes and sexual assaults and the reluctance or inability of many victims of those crimes to seek professional help."); Nicholson v. Williams, 203 F.Supp. 2d 153, 252 (E.D.N.Y. 2002) ("It desecrates fundamental precepts of justice to blame a crime on the

victim."). See generally David P. Bryden & Sonja Lengnick, Rape in the Criminal Justice System, 87). Crim. L. & Criminology 1194, 1221 (1997) (discussing underreporting of sexual abuse in the U.S., noting that "[s]ome rape victims are too upset or too embarrassed at the prospect of answering a stranger's intimate questions about the incident, or so ashamed that they do not want anyone, even their friends, to know about it").

Second, the ALJ found that Dr. Shapiro's notes show that Konetschni retained a "good mental status" until December 2012. (Tr. 17). A review of his notes reflects otherwise. On August 16, 2010, Dr. Shapiro noted that Konestschni presented with reports of "[f]lashbacks, nightmares, other [symptoms] of [PTSD]. (Tr. 367-68). Dr. Shapiro diagnosed her as suffering from PTSD, increased her Xanax dosage, added a prescription for Intuniv, and strongly urged her to seek counseling. (Id.). On January 11, 2011, Konetschni was offered a choice between Xanax or Clonazepam, both powerful anti-anxiety drugs. (Tr. 367). On March 1, 2011, Dr. Shapiro observed that she was "very rough" with "much depression and agitation" and he increased her dosages of Effexor (for depression and Lamictal (for bipolar disorder) and added a prescription for clonidine (for anxiety). (Tr. 367). On November 1, 2011, although Dr.

Shapiro noted Konetschni was "better overall," he reported she incurred a new problem with three episodes of command hallucinations telling her to kill or harm herself. (Tr. 367).  The ALJ ignored Dr. Shapiro's opinion contained in the Pennsylvania Department of Public Welfare employability Re-Assessment Form.  (Tr. 345-47).  There, Dr. Shapiro noted extreme mental energy changes with crippling tension headaches and a suicidal risk. (Id.)  These observations by Konetschni's treating psychiatrist can hardly be considered "good mental status" as the ALJ stated in his decision.

Finally, there is nothing in the record for the ALJ to leap to the unfounded conclusion that Dr. Shapiro's opinion "is a likely exaggeration of the claimant's functional restrictions in order to assist the claimant in obtaining disability benefits." (Tr. 17).  See Lester v. Chater, 81 F.3d 821, 832 (9th Civ. 1995) ("The [ALJ] may not assume that doctors routinely lie in order to help their patients collect disability benefits."); Tully v. Colvin, 943 F.Supp. 2d 1157, 1170 (D. Or. 2013) ("[T]he ALJ's unfounded speculation that a treating physician would lie or exaggerate to assist a patient, without evidence of actual impropriety, is an impermissible assumption in determining Social Security disability cases.").

Additionally, the ALJ made reference to Konetschni performing "a significant degree of volunteer work" for both a food pantry and an animal shelter. (Tr. 18).  However, the record reveals that Konetschni stated she volunteers once per week for a food pantry (Exhibit 3e) and one hour per week (increments of one-half hour) at the animal shelter (Tr. 45-46).  This is hardly a significant amount of time.  Sporadic and transitory activities cannot be used to show an ability to engage in sustained substantial gainful activity.  Fargnoli v. Massanari, 247 F.3d 34, 40 n.5 (3d Cir. 2001); see also Schwartz v. Colvin, No. CV-13-45-JTR, 2013 WL 6903729, at (E.D. Wash. Dec. 31, 2013). (sporadic volunteer work not indicative of ability to sustain the demands of regular, full time employment).

Because the ALJ failed to adequately consider the medical opinions rendered by Dr. Shapiro, Konetschni's treating psychiatrist, the court is unable to recommend that the ALJ's decision is supported by substantial evidence.

In view of our recommendation to vacate and remand to conduct a new administrative hearing, it is not necessary to discuss the plaintiff's second and final assignment of error that the ALJ erred in finding the plaintiff not credible.

## V.     Recommendation

Based on the foregoing, IT IS RECOMMENDED that the Commissioner's final decision denying Konetschni's application for benefits under Title II of the Social Security Act be vacated and remanded to conduct a new administrative hearing. It is FURTHER RECOMMENDED that the Commissioner be directed to "reopen and fully develop the record before rendering a ruling" on the plaintiff's claim. Thomas v. Comm'r of Soc. Sec., 625 F.3d 798, 800 (3d Cir. 2010).


*s/ Joseph F. Saporito, Jr.*
**JOSEPH F. SAPORITO, JR.**
**U.S. Magistrate Judge**

**Dated: November 23, 2015**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


NICOLE KONETSCHNI,            :
              Plaintiff,       :       NO. 3:14-cv-2087
                               :
    v.                       :
                               :       (Mariani, J)
CAROLYN W. COLVIN,            :       (Saporito, M.J.)
Acting Commissioner of        :
Social Security,              :
              Defendant.       :


## NOTICE

Notice is hereby given that the undersigned has entered the foregoing Report and Recommendation dated November 23, 2015. Any party may obtain a review of this Report and Recommendation pursuant to Local Rule 72.3, which provides:

> Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified   proposed

findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Failure to file timely Objections to the foregoing Report and

Recommendation may constitute a waiver of any appellate rights

s/ Joseph F. Saporito, Jr.
Joseph F. Saporito, Jr.
U.S. Magistrate Judge

November 23, 2015